Northern Bank v. Commissioner.
Northern Bank v. Commissioner
Docket No. 72770.
United States Tax Court
T.C. Memo 1962-288; 1962 Tax Ct. Memo LEXIS 21; 21 T.C.M. (CCH) 1526; T.C.M. (RIA) 62288; December 3, 1962
Harvey W. Peters, Esq., 1308 Prospect Ave., Milwaukee, Wis., for the petitioner. Vernon R. Balmes, Esq., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: The respondent determined deficiencies in the petitioner's income tax for the years ended December 31, 1954, and December 31, 1955, in the respective amounts of $40,560 and $36,399.57. Certain adjustments set forth in the statutory notice of deficiency were not contested by the petitioner. The only issue to be determined is whether the respondent correctly disallowed any deductions for additions to petitioner's reserve for bad debts for the years in question. Findings of Fact All of the facts are stipulated and are so found. Petitioner is a national banking corporation organized *22 in 1928, having its principal office in Milwaukee, Wisconsin. It is engaged in the general business of banking. Federal income tax returns were filed for the years 1954 and 1955 with the district director of internal revenue, Milwaukee, Wisconsin. Petitioner reports its income for income tax purposes on a calendar year, cash basis of accounting. Petitioner was orginally incorporated under the name of North Milwaukee State Bank and had its place of business in North Milwaukee. In a letter dated February 2, 1932, the State of Wisconsin Bank Department suggested to the president and board of directors of the petitioner that unless they saw an opportunity to increase the volume of business, they should consider merging with one of the neighboring banks. Later in the same year the shareholders of petitioner, then the North Milwaukee State Bank, accepted a voluntary assessment of 100 percent of the par value of their shares, and a segregated trust was established to provide for repayment of deposits due petitioner's depositors. The State of Wisconsin Banking Department, in a letter dated February 1, 1935, advised an absorption of the petitioner in view of the unsatisfactory condition *23 of its loans and the deficits in earnings for the preceding years. At a special meeting of the stockholders of petitioner on September 14, 1936, an entirely new board of directors was elected. At said meeting the stockholders voted to increase the authorized capital stock of petitioner from $35,000 to $100,000 with an increase in the authorized number of shares from 1750 to 5000; voted to change petitioner's name to the present name of "Northern Bank"; and voted to move petitioner's office. Since 1939, petitioner has operated under its present name and at its present place of business at 3536 West Found du Lac Avenue, Milwaukee, Wisconsin. In a letter dated September 10, 1954, the Wisconsin Commissioner of Banks made the following comments to petitioner's president and board of directors concerning loans: With no adversely classified loans, no exceptions to required supporting information and with only a nominal percentage of overdue paper, it is apparent that you have continued to be conservative in extending credit and that the loans on your books are receiving proper supervision. Beginning with the taxable and calendar year 1941, petitioner adopted the reserve method *24 of treating bad debts for Federal income tax purposes with the consent of the Commissioner of Internal Revenue and has thereafter employed the reserve method in lieu of claiming deductions for bad debt losses actually sustained in the particular year. On tax returns filed for the taxable years 1954 and 1955, being the years here in issue, petitioner claimed the respective amounts of $78,000 and $70,000 as deductions for additions to its reserve for bad debts. Respondent disallowed the full amounts as bad debt reserve additions and income tax deductions. Petitioner's reserve for bad debts balance, representing amounts allowed as deductions for income tax purposes less losses charged there against, was $156,158.63 as of January 1, 1954. The net uninsured loans outstanding, net bad debt losses and the ratios of net losses to net loans of the petitioner for each of the years 1928 to 1955, as well as the ratios utilized by each respective party, are as follows: Ratios Per
Commis. of
Ratios
Internal
Reported
Revenue
on 1954-
Uninsured
Bad Debt
Loss
Deficiency
1955 Tax
Year-End
Loss
(Recovery)
Notice
Returns
Year
Loan Total
(Recovery) *
Ratio *
Loss Ratio *
Filed *
1928
$ 110,059.20
$0
0.000%
0.329%
1929
187,233.72
0
0.000
0.554
1930
203,121.22
0
0.000
0.563
1931
146,109.48
0
0.000
0.000%
1.306
1932
101,637.02
784.70
0.772
0.772
2.565
1933
91,639.07
0
0.000
0.000
6.475
1934
83,933.60
1,475.00
1,757
1.757
3.625
1935
80,527.87
691.48
0.859
0.859
1.570
1936
377,448.47
1,303.99
0.345
0.345
0.870
1937
714,028.84
3,603.90
0.505
0.505
0.505
1938
824,974.79
8,844.11
1.072
1.072
1.072
1939
1,397,388.61
105.15
0.001
0.001
0.001
1940
1,781,214.77
4,201.01
0.236
0.234
0.234
1941
1,773,144.52
200.15
0.011
0.011
0.011
1942
1,706,164.07
( 181.62)
(0.010)
(0.010)
(0.010)
1943
2,504,952.61
419.84
0.016
0.016
0.016
1944
2,509,295.23
( 216.82)
(0.008)
(0.008)
(0.008)
1945
3,672,225.32
(1,073.87)
(0.028)
(0.028)
(0.028)
1946
5,547,444.70
1,216.03
0.022
0.022
0.022
1947
5,861,723.48
542.07
0.009
0.009
0.009
1948
7,003,162.57
464.76
0.007
0.007
1949
6,873,786.91
3,327.53
0.048
0.048
1950
8,360,930.27
1,113.68
0.013
0.013
1951
8,337,112.08
(1,314.93)
(0.016)
1952
9,394,441.31
( 145.06)
(0.002)
1953
10,145,181.87
759.76
0.007
1954
13,648,221.20
372.20
0.003
1955
13,088,105.61
150.63
0.001
Total - 20
5.625%
19.681%
years
Average -
0.281%
0.984%
20-year
period
Maximum
Reserve
Allowable -
1954
$115,527.57
$404,552.07
1955
110,731.05
387,755.67
*25 The ratios for the years 1928 through 1936 reported by the petitioner on its 1954 and 1955 tax returns represent the average loss ratios for banks of the Seventh Federal Reserve District. Ultimate Finding of Fact Petitioner's reserve for bad debts balance as of January 1, 1954, was adequate and reasonable without any additions for the years 1954 and 1955. Opinion The question here is one of fact. The fundamental issue to be determined is whether the Commissioner of Internal Revenue, by disallowing any additions to petitioner's reserve for bad debts, has unreasonably exercised the discretion vested in him by section 166(c) of the Internal Revenue Code of 1954, which provides: (c) RESERVE FOR BAD DEBTS. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. Where the Commissioner has allowed or refused to allow any additions to the reserve for bad debts, the taxpayer has a heavy burden to show the Commissioner's abuse of discretion. Consequently, the taxpayer must *26 present to this Court sufficient facts to show that the Commissioner acted arbitrarily or unreasonably. Petitioner's primary contention is that the respondent abused his discretion in this case by relying completely on the mechanical formula procedures contained in Mimeograph 6209, 1947-2 C.B. 26, and related revenue rulings. In Mimeograph 6209 the Commissioner approved a method for computing allowable reserves for bad debts of banks based on a 20-year moving average of the ratio of losses to outstanding loans for each year including the taxable year. Revenue Ruling 54-148, 1954-1 C.B. 60, was later issued, permitting a bank to use an average experience factor based on any twenty consecutive years of experience after 1927. Under this ruling, newly organized banks availing themselves of this alternative method are permitted to substitute comparable experience of other comparable banks for that portion of the 20-year period during which they were not in existence. Revenue Ruling 54-597, 1954-2 C.B. 90, allows a bank to compute its loss ratio on the basis of the total net losses for the 20-year period divided by the total outstanding loans *27 for that period, or on the basis of an average of the total percentages computed for each of the twenty years. In accordance with Mimeograph 6209 and Revenue Rulings 54-148 and 54-597, respondent computed petitioner's average bad debt loss ratio by using petitioner's own experience. Actual bad debt losses were divided by the uninsured year-end loans totals for each of the years 1928 through 1955. Respondent then selected the twenty consecutive year period from 1931 through 1950 during which period petitioner experienced its highest total loss ratios. This total of.05625 produced an average loss ratio of.00281. Respondent then applied this average loss ratio to the outstanding net loans at December 31, 1954, and December 31, 1955, and arrived at maximum allowable bad debt reserves of approximately $115,000 and $110,300 at December 31, 1954, and December 31, 1955, respectively. The maximum reserve allowed by the rulings is three times the average experience factor applied to outstanding loans. Since petitioner's reserve for bad debts exceeded $155,600 at the end of 1954 and 1955, respondent determined that no additions were necessary. Petitioner contends that the rulings relied on *28 by the respondent do not have the force and effect of law and that a strict application of the mechanical formula of such rulings amounts to a complete disregard of petitioner's actual bad debt experience. The basis for this contention is that many of the loans resulting in worthless debts, which were made by the predecessor management during the depression years, were not written off until after the new management went into effect in 1936. At the time these old debts were taken as losses by the new management, the outstanding loans were extensively greater than the loan totals when the loans were made. Consequently, the loss ratios were much smaller during the years the debts were actually written off. Because of "petitioner's serious bad debt loss plight during the economic collapse of the 1930s," petitioner asserts that the losses for the years 1928 through 1936, the period of the predecessor management, should be reconstructed to reflect losses attributable to the low loan totals of said years. In the alternative, petitioner asserts that it should be allowed to substitute the bad debt ratios of member banks of the Seventh Federal Reserve District for those years and to use actual *29 bad debt experience of the petitioner for the remaining years 1937 through 1947, as was done on its income tax returns. We find no authority to support either contention. In C. P. Ford and Co., Inc., 28 B.T.A. 156 (1933) this Court said: A taxpayer has an absolute right to choose to deduct his worthless debts when they are ascertained to be worthless and charged off, but if instead he chooses to deduct additions to a reserve, he subjects himself to the reasonable discretion of the Commissioner. The rulings in question are declaratory of the Commissioner's position regarding what constitutes reasonable additions to and maximum reserves for bad debts of banks in general. This position is based upon the belief that the average loss ratios over a 20-year period constitute a representative period in a bank's history, indicative of the probable annual accruing bad debt losses in the future. Having determined that petitioner has subjected itself to the reasonable discretion of the Commissioner as set forth in Mimeograph 6209 and related rulings, we feel that the computing methods contained therein must be followed. There is no precedent for the juggling of subsequent *30 losses back to the years in which the loans were initially made or to the period in which a previous management was in control as the petitioner has proposed. Certainly there are no provisions for this in the rulings, which we believe are reasonable. We are not convinced that the mere change in management entitles the petitioner to a different application of the formulas contained in the rulings. Petitioner's alternative proposal, to substitute the loss ratios of member banks of the Seventh Federal Reserve District, is completely devoid of merit. Revenue Ruling 57-350, 1957-2 C.B. 144, specifically provides that, "For that portion of the twenty-year period selected during which the bank was in existence, it is required to use its own experience." This precise question was before us in the case of First National Bank of La Feria, 24 T.C. 429 (1955), aff'd 234 F. 2d 868 (C.A. 5, 1956), and Union National Bank and Trust Company of Elgin, 26 T.C. 537 (1956). In those cases the taxpayer banks contended that because of a change in loan policies due to a change in management, they should be allowed to substitute the loss experience *31 of other banks. We held that a change in management did not alter the requirement that a bank use its own experience if it was in existence during the twenty-year period selected. In American State Bank v. U.S., 279 F. 2d 585 (C.A. 7, 1960), certiorari denied 364 U.S. 881 (1960), the taxpayer bank was required to use its own loss experience even though it was a newly organized bank during the depression years and therefore had little or no loss experience of its own during the heavy loss years, whereas other banks sustained heavy losses on loans made during the more prosperous pre-depression period. Moreover, the American State Bank, a fellow member of petitioner bank in the Seventh Federal Reserve District, was denied additional increases to its reserve to bring it up to the maximum allowed other banks in the district, even though it had a smaller loss ratio than the petitioner bank in this case. Petitioner further urges that the Commissioner has discriminated against it in refusing to allow it comparable maximum reserves that other banks of the Seventh Federal Reserve District have been allowed. We think the fallacy of this contention is best answered *32 by petitioner's own statement "that the reasonableness of a bad debt reserve deduction depends upon the facts applicable to the particular taxpayer." Whether the loss experience of the other district members is material or not, it has not been adequately shown that these banks are, in fact, comparable to the petitioner bank. There is no evidence of the nature and size of the outstanding loans of these banks, or their loan policies, or their anticipated future losses. Even if it were determined that these banks are comparable to petitioner, the fact would remain that petitioner would not be entitled to the same loss ratio because its actual loss ratio, assuming the proposed reconstruction, is not as great as the average for the other Seventh Federal Reserve District banks. In First National Bank of La Feria, supra, we denied the taxpayer the right to substitute the experience of other banks saying that there was no reason for allowing the taxpayer a recompense based upon losses not suffered by it. Suffice it to say, the question here is whether petitioner has been allowed to build up a reserve for bad debts adequate to recompense it for past losses and to protect it against anticipated *33 future losses. We agree with petitioner that Mimeograph 6209 and its related rulings do not have the force and effect of law. See Miners National Bank of Wilkes-Barre, 33 T.C. 42 (1959). A strict adherence to the formulas contained in these rulings might, under certain conditions, result in a harsh and unreasonable refusal to allow adequate additions to a bad debt reserve. This was true in cases cited by petitioner where the courts took notice of the influence of outside factors on future loss expectations. In the case of the petitioner, however, there appear to be no outside factors to affect its loss experience to any great extent. Furthermore, petitioner's loss experience indicates a decreasing trend in actual losses. The bad debt write-offs for the two years in question total only $522.83, an infinitesimal amount when compared to the 1955 year-end loan total of $13,088,105.61 and the already existing amount of $156,158.63 in the accumulated reserve for bad debts as of January 1, 1954. We must also take note of the Wisconsin Bank Commissioner's statement, set out above, to the effect that petitioner continues to be conservative in extending credit. In C. P. Ford and Company, Inc., supra, *34 this statement concerning reserves appeared: Since the reserve is necessarily the embodiment of estimates, the estimate for any year must be measured by the necessities of the reserve as those necessities appear at the time the estimate is made. So long as the method adopted accomplishes its purpose, there is reason for its consistent and continued use; but beyond that, it loses its force. The evidence in this case falls short of proving that the Commissioner's determination was erroneous. Any addition to petitioner's reserve would increase the reserve to an amount the necessity of which is not disclosed by petitioner's past experience or by its prospects for the future. The amount of the reserve is already far greater than the amount of all losses incurred by petitioner in the past. Accordingly, we sustain respondent's determination. Decision will be entered for the respondent. Footnotes
*. Net recoveries denoted in parentheses.↩